EMR/EWS/RSB
F.#2023R00683

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

LEON WILSON,

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No. 24-CR-465 (PKC)

# MEMORANDUM OF LAW IN OPPOSITION TO
## THE DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITAL AND NEW TRIAL

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York

Erin M. Reid
Eric Silverberg
Raffaela Belizaire
Assistant U.S. Attorneys
     (Of Counsel)

<u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ......................................................................................... 1

RELEVANT FACTUAL BACKGROUND........................................................................ 1

I.    Pre-Trial Proceedings ................................................................................................ 1

      A. Arrest and Indictment........................................................................................... 1

      B.  Motions *In Limine* To Admit Other Act Evidence............................................. 2

      C. Motion *In Limine* To Preclude Excessive Evidence Regarding MDC-Brooklyn Conditions, Including Contraband Smuggling ..................................................... 4

II.   The Government's Trial Proof .................................................................................... 6

      A. Applicable Policies, Procedures, and Training Governing BOP Employees..................... 6

      B.  The September 4 Shooting .................................................................................... 9

      C. Other Act Evidence Establishing that the Defendant Acted Willfully.......................... 12

            1. Threatening Interactions with MDC-Brooklyn Inmate Dylan Carreras in the Weeks Before the Shooting.................................................................................... 12

            2. Stop-And-Frisk and False Report on September 5, 2023............................. 13

      D. Other Evidence Concerning Contraband Smuggling at MDC-Brooklyn.......................... 14

      E.  Defendant's Testimony ....................................................................................... 14

III.  Charge Conference .................................................................................................. 17

      A. Justification Jury Instruction ............................................................................. 17

      B.  Uncalled Witnesses Equally Available Jury Instruction ................................... 20

IV.   Defense Counsel's Improper Closing Argument About Carreras Testimony, Prompting the Need for Supplemental Jury Instruction.................................................. 20

V.    Jury Deliberations.................................................................................................... 23

LEGAL STANDARDS ................................................................................................... 23

I.    Rule 33 ..................................................................................................................... 23

II.   Rule 29 ..................................................................................................................... 23

ARGUMENT ....................................................................................................................... 25

I.    The Defendant's Rule 33 Motion Should Be Denied........................................................ 25

      A. The Court's Evidentiary Rulings Were Correct .......................................................... 25

            1.  The Court Properly Admitted the Carreras Testimony, Which Was Highly Probative of
                Willfulness and Not Unduly Prejudicial ...................................................... 25

            2.  The Cumulative Effect of the Carreras Testimony and the September 5 Report was Not
                Unduly Prejudicial.......................................................................................... 29

            3.  The Court Gave the Defendant Substantial Latitude to Offer Evidence and Make
                Arguments About MDC-Brooklyn.................................................................. 30

      B.  The Defendant's Challenges to the Jury Instructions Are Without Merit........................ 33

            1.  The Defendant Cannot Complain About the Very Justification Charge He Sought.... 33

                  i. The Defendant Waived Any Challenge to the Justification Charge................... 33

                  ii. The Expanded Justification Charge Was Proper ............................................... 35

            2.  The Defendant Never Asked for a "Missing Evidence" Charge................................. 37

            3.  The Court's Supplemental Instruction After Closing Statements Was Proper Because
                the Defendant Improperly Invited the Jury to Speculate............................................ 38

II.   The Defendant's Rule 29 Motion Should Be Denied........................................................ 40

      A. The Government's Evidence Proved that the Defendant Acted Wilfully Under Section 242
         40

      B. The Defendant's Post-Trial Challenge to § 242 as a Crime of Violence Is Both Untimely
         and Wrong.................................................................................................................... 43

CONCLUSION.................................................................................................................... 45

TABLE OF AUTHORITIES

Page(s)

CASES

Atkins v. New York City,
143 F.3d 100 (2d Cir. 1998) ................................................................................. 23

Rodella v. United States,
435 F. Supp. 3d 1222 (D.N.M. 2020),
aff'd, 852 F. App'x 323 (10th Cir. 2021) ............................................................. 44

Screws v. United States,
325 U.S. 91 (1945)...................................................................................... 40, 41, 42

Smith v. Carpenter,
316 F.3d 178 (2d Cir. 2003) ................................................................................. 23

United States v. Aguiar,
737 F.3d 251 (2d Cir. 2013) ................................................................................. 24

United States v. Al-Moayad,
545 F.3d 139 (2d Cir. 2008) ................................................................................. 30

United States v. Artuso,
618 F.2d 192 (2d Cir. 1980) ................................................................................. 24

United States v. Autuori,
212 F.3d 105 (2d Cir. 2000) ................................................................................. 24

United States v. Boone,
828 F.3d 705 (8th Cir. 2016) ................................................................................ 26

United States v. Boyle,
No. S1 08 CR 523 (CM), 2010 WL 4457240 (S.D.N.Y. Oct. 27, 2010),
aff'd, 452 F. App'x 55 (2d Cir. 2011) ................................................................... 33

United States v. Bradley,
196 F.3d 762 (7th Cir. 1999) ................................................................................ 41

United States v. Brown,
654 Fed. App'x. 896 (10th Cir. 2016) .................................................................. 41

United States v. Brugman,
364 F.3d 613 (5th Cir. 2004) ................................................................................ 27

United States v. Civelli,
883 F.2d 191 (2d Cir. 1989) ................................................................................. 38

United States v. Coonan,
938 F.2d 1553 (2d Cir. 1991) ........................................................................ 34

United States v. Cowden,
882 F.3d 464 (4th Cir. 2018) ........................................................................ 26

United States v. Davila,
461 F.3d 298 (2d Cir. 2006) ........................................................................ 43

United States v. Davis,
531 Fed. Appx. 65 (2d Cir. 2013) ................................................................ 17

United States v. Denkberg,
139 F.4th 147 (2d Cir. 2025) ........................................................................ 39

United States v. Desena,
260 F.3d 150 (2d Cir. 2001) ........................................................................ 24

United States v. Desinor,
525 F. 3d 193 (2d Cir. 2008) ........................................................................ 17

United States v. Dominguez Benitez,
542 U.S. 74 (2004) ...................................................................................... 36

United States v. Espaillet,
380 F.3d 713 (2d Cir. 2004) ........................................................................ 24

United States v. Ferguson,
758 F.2d 843 (2d Cir. 1985) ........................................................................ 34

United States v. Ford,
435 F.3d 204 (2d Cir. 2006) ........................................................................ 39

United States v. Frady,
456 U.S. 152 (1982) ...................................................................................... 36

United States v. Giovanelli,
464 F.3d 346 (2d Cir. 2006) ........................................................................ 34

United States v. Gleason,
616 F.2d 2 (2d Cir. 1979),
cert. denied, 444 U.S. 1082, 100 S. Ct. 1037, 62 L.Ed.2d 767 (1980) ................................... 39

United States v. Gracesqui,
730 F. App'x 25 (2d Cir. 2018) .................................................................... 39

United States v. Han,
230 F.3d 560 (2d Cir. 2000) ........................................................................ 39

United States v. Harris,
    853 F.3d 318 (6th Cir. 2017) ................................................................................ 44

United States v. Henry,
    888 F.3d 589 (2d Cir. 2018) ................................................................................. 39

United States v. Hertular,
    562 F.3d 433 (2d Cir. 2009) ................................................................................. 34

United States v. House,
    684 F.3d 1173 (11th Cir. 2012) ....................................................................... 41, 42

United States v. Jabar,
    19 F.4th 66 (2d Cir. 2021) ................................................................................... 24

United States v. Krug,
    No. 15-CR-157-A, 2017 WL 907817 (W.D.N.Y. Mar. 8, 2017) ............................ 26

United States v. Livoti,
    196 F.3d 322 (2d Cir. 1999) ....................................................................... 26, 27, 28

United States v. Marcus,
    560 U.S. 258 (2010) ............................................................................................ 36

United States v. McCourty,
    562 F.3d 458 (2d Cir. 2009) ................................................................................. 23

United States v. Mickens,
    926 F.2d 1323 (2d Cir. 1991) ......................................................................... 26, 28

United States v. Morgan,
    385 F.3d 196 (2d Cir. 2004) ................................................................................. 24

United States v. Olano,
    507 U.S. 725 (1993) ....................................................................................... 33, 36

United States v. Paccione,
    949 F.2d 1183 (2d Cir. 1991) ............................................................................... 31

United States v. Patterson,
    No. 21-1678-cr, 2022 WL 17825627 (2d Cir. Dec. 21, 2022) ................................ 38

United States v. Prawl,
    149 F.4th 176 (2d Cir. 2025) ........................................................................... 36, 37

United States v. Proano,
    912 F.3d 431 (7th Cir. 2019) ............................................................................... 41

United States v. Quinones,
    511 F.3d 289 (2d Cir. 2007) .................................................................................. 33

United States v. Rangosta,
    970 F.2d 1085 (2d Cir. 1992) .............................................................................. 23

United States v. Redrick,
    841 F.3d 478 (D.C. Cir. 2016) ............................................................................ 44

United States v. Reyes,
    157 F.3d 949 (2d Cir. 1998) ................................................................................ 24

United States v. Rodella,
    804 F.3d 1317 (10th Cir. 2015) ..................................................................... 27, 41

United States v. Rosa,
    17 F.3d 1531 (2d Cir. 1994) ................................................................................ 24

United States v. Rosenthal,
    9 F.3d 1016 (2d Cir. 1993) ............................................................................ 23, 24

United States v. Sanchez,
    969 F.2d 1409 (2d Cir. 1992) .............................................................................. 23

United States v. Shannan,
    66 F.4th 1177 (8th Cir. 2023) ............................................................................. 44

United States v. Spruill,
    808 F.3d 585 (2d Cir. 2015) .......................................................................... 33, 34

United States v. Velez,
    652 F.2d 258 (2d Cir. 1981) ................................................................................ 39

United States v. Weintraub,
    273 F.3d 139 (2d Cir. 2001) ................................................................................ 36

United States v. White,
    552 F.3d 240 (2d Cir. 2009) ................................................................................ 38

United States v. White,
    68 Fed. App'x 707 (7th Cir. 2003) ..................................................................... 26

United States v. Williams,
    930 F.3d 44 (2d Cir. 2019) ............................................................................ 33, 34

United States v. Writers & Research,
    113 F.3d 8 (2d Cir. 1997) .................................................................................... 24

United States v. Young,
  745 F.2d 733 (2d Cir. 1984) ............................................................................ 34

United States v. Zhong,
  26 F.4th 536 (2d Cir. 2022) ............................................................................ 29

## STATUTES

18 U.S.C. § 242 ............................................................................................... passim

18 U.S.C. § 924(c) .......................................................................................... 1, 25, 43

N.Y. PENAL LAW § 35.15 ................................................................................ 18

N.Y. PENAL LAW § 35.30 ................................................................................ 17

## RULES

Fed. R. Crim. P. 12(b) ..................................................................................... 43

Fed. R. Crim. P. 29 ......................................................................................... 1, 23

Fed. R. Crim. P. 30 ......................................................................................... 35, 38

Fed. R. Crim. P. 33(a) ..................................................................................... 23

Fed. R. Crim. P. 52(b) ..................................................................................... 35

Fed. R. Evid. 403 ............................................................................................ 4

Fed. R. Evid. 404(b) ........................................................................................ 2, 3, 26, 27

## PRELIMINARY STATEMENT

The defendant, an on-duty correctional officer at the Metropolitan Detention Center-Brooklyn ("MDC-Brooklyn"), chased a civilian vehicle a mile from the jail's property line and—unprovoked—fired multiple rounds into the BMW. One of the bullets struck the car's back passenger. Even after firing, the defendant continued chasing the BMW. The defendant did not call the police or even for backup. Nor did he report the shooting to his superior officers at MDC-Brooklyn, despite clear Bureau of Prisons ("BOP") rules requiring employees to report any firearm discharge event within 24 hours. Instead, the defendant tried to cover up his crimes, going so far as to take the stand and repeatedly perjure himself. The jury saw through the defendant's lies and convicted him after deliberating for just a few hours.

The defendant now moves for acquittal or, in the alternative, a new trial under Federal Rules of Criminal Procedure 29 and 33, respectively. The defendant's motion mischaracterizes the factual record below and presses several arguments that contradict positions he took at trial or otherwise waived. The motion should be denied.

## RELEVANT FACTUAL BACKGROUND

Pre-Trial Proceedings

Arrest and Indictment

On September 30, 2024, the defendant was arraigned on a criminal complaint charging him with deprivation of rights under color of law, in violation of Title 18, United States Code, Section 242. A grand jury in this district subsequently returned an indictment charging him with deprivation of rights under color of law (Count One) and discharging a firearm during a crime of violence, in violation of Title 18, United States Code, Section 924(c) (Count Two).

<u>Motions *In Limine* To Admit Other Act Evidence</u>

Prior to trial, on September 22, 2025, the Government moved to admit two categories of other act evidence beyond those charged in the Indictment.  (See Government's September 22, 2025 Motion in Limine ("Gov't MIL"), ECF No. 33, at 5-16.)  First, the government sought to admit evidence of the defendant's threatening behavior towards Dylan Carreras, an MDC-Brooklyn inmate, in or about August 2023.  (Id. at 6-7.)  The government specifically sought to admit evidence of (i) an incident when the defendant told Carreras that he had chased a woman driving a silver Honda off MDC-Brooklyn property and, while resting his hand on his gun, threatened that if the woman ever returned he would put a bullet in the woman's head; (ii) a second encounter when the defendant accused Carreras of hiding contraband in a garbage can, threatened him with his gun, and—after Carreras responded that the gun shot rubber bullets—took out his gun, cocked it, and sent a bullet flying from the chamber; and (iii) a third encounter when, after they verbally sparred, the defendant grabbed Carreras by the arm, violently threw him up against the wall, and needlessly bent his fingers and arm behind his back while yelling, "I will fucking kill you."  (Id.)  Second, the government sought to introduce evidence that the defendant conducted a stop-and-frisk off MDC-Brooklyn property on September 5, 2023, the day after the September 4, 2023 shooting, and filed a report falsely claiming that it occurred on BOP property.  (Id. at 7-8.)

The government argued that both categories of evidence were admissible as direct evidence of the charged crimes and pursuant to Rule 404(b).  Among other things, the government contended that both categories of evidence were probative of the defendant's state of mind and whether he acted willfully during the September 4, 2023 shooting.  (Id. at 8-16.)  The defendant opposed the admission of both categories of evidence, arguing that they were not probative and were unduly prejudicial.  (See Defendant's October 5, 2025 Opposition to the Government's Motion in Limine, ECF No. 34 at 2-5.)

2

Following oral argument on October 9, 2025, the Court granted the government's motion to admit evidence of the first two incidents involving Carreras and evidence of the September 5, 2023 stop-and-frisk and false report. (See October 9, 2025 Pre-Trial Conference ("PTC") Tr. 18, 25.) Although the Court disagreed with the government that the evidence was admissible as direct evidence of the charged crimes, the Court held that the evidence was admissible pursuant to Rule 404(b).

The Court first ruled that the evidence of the first two incidents involving Carreras were admissible under Rule 404(b) to show the defendant's "state of mind, willfulness, motive" and "knowledge or absence of mistake in terms of what he did on September 4." (See id. at 6-7.) The Court explained that willfulness was a "key element" of the charged offense "because . . . officers are given a certain amount of authority to use violence or to use other means to stop illegal activity," and because "the government has to show here that the defendant knew he wasn't supposed to be doing what he was doing." (Id. at 10-11.) As to the defendant's warning that he would put a bullet in the head of the female driver who came onto MDC-Brooklyn property, the Court reasoned, "this extremely clear statement that he is—he is thinking about, very aggressively, and in some, one could say, inappropriately preventing potential smugglers or people who shouldn't be at MDC from being there" "goes to his mindset of what drives him on that day in September 4th to do that[.]" (Id. at 12-13.) However, the Court denied the government's motion to introduce evidence of the third incident, when the defendant threw Carreras up against the wall, which the Court found did not go to the defendant's state of mind. (Id. at 17.)

The Court also ruled that the evidence of the September 5, 2023 stop-and-frisk and false report was admissible under Rule 404(b) as "evidence of [the defendant's] mindset" because it was "quite probative of what he was thinking when he didn't report the incident on September

3

4th."  The Court distinguished the evidence of the September 5 incident with the evidence that counsel sought to introduce regarding general conditions at the MDC, saying, "[t]he problem with what you want to do . . . is there's no connection to him.  These are statements out of his own mouth."  (Id. at 24.)

The Court rejected the defendant's argument that evidence of both the first two Carreras incidents and the September 5 incident were unduly prejudicial under Rule 403, explaining that "because this is a situation where there's no question he did the acts and the only question is did he do them for a wrong purpose . . . knowing he was doing something wrong" the risk of prejudice was low and outweighed by the probative value.  (Id. at 25.)

At trial, at the conclusion of the government's case and after Carreras had testified (which is recounted in greater detail below), the Court clarified its reasoning, saying that it recognized that the "propensity concern arises from some suggestion that if the [d]efendant was willing to use what are considered illegal or improper means to stop contraband smuggling, namely threatening . . . that shows that he was willing to use extralegal means on the night in question." (Trial Tr. 1020.)  However, the Court emphasized, "I want the record to be clear that I still don't think that that outweighed the probative value of establishing willfulness, which is the Government's burden."  (Id.)  "So having sort of rethought the potential prejudice, I still find that the Government should have been allowed to introduce the Carreras prior incidents to inform the jury if they think it's relevant and credible to Mr. Wilson's mindset, motive, intent, knowledge, et cetera on the night of September 4th."  (Id. at 1020-21.)

### Motion *In Limine* To Preclude Excessive Evidence Regarding MDC-Brooklyn Conditions, Including Contraband Smuggling

The government also moved *in limine* to preclude excessive evidence and argument concerning contraband smuggling.  (Gov't MIL at 24-26.)  The government acknowledged that

4

the evidence at trial would feature evidence of contraband smuggling issues at MDC-Brooklyn, including from BOP witnesses and an MDC-Brooklyn inmate. (Id. at 25.) For that reason, the government noted that it "believe[d] it [was] appropriate for the defendant to meet that evidence by questioning witnesses and eliciting testimony, within appropriate limits, on the subject." (Id.)

The Court agreed. It observed that some discussion of contraband smuggling at trial would be unavoidable, and indeed that the government's own evidence gave the defense "some ammunition to argue that there's a drug smuggling problem" at MDC-Brooklyn. (PTC Tr. 40.) However, the Court cautioned that excessive focus on contraband smuggling into the jail, untethered from the trial evidence, would invite jury nullification and public safety justification. (Id. at 40.) The Court ordered that the defendant could "ask the inmates about their own contraband smuggling, et cetera, or possession of contraband," but should not "ask the guards about their work conditions or about whether or not contraband smuggling is a big problem at the facility." (Id. at 40-41.) On the government's motion, the Court also precluded the defense from introducing evidence about the general conditions at MDC-Brooklyn, including inmate violence and staff shortages. (Id. at 42.)

Defense counsel acknowledged that it understood the Court's rulings. (Id. at 41.) But in opening statements, counsel immediately violated them.

> Good afternoon. You're going to hear the phrase "under color of law" quite a bit throughout this trial. It sounds technical, right? It sounds like things that you probably haven't discussed, you probably haven't heard before. All it really means is that a Government officer used his position of power to do something wrong. But that's not really what this case is about. This case is about the color of reality. And the reality in this case is that the MDC Brooklyn location, one of the most dangerous detention centers in the United States, has a building full of inmates that are smuggling contraband, drugs, and weapons from the outside. Now, how are they doing that? They're doing that from people that come up to the

> property with packages, drugs, contraband, weapons. Lines come
> down from five or six stories below and somebody --

(Trial Tr. 281.)  The government lodged an objection, which the Court sustained.  (Id. at 281, 463.)

The Government's Trial Proof

The government proved the following facts at trial:

Applicable Policies, Procedures, and Training Governing BOP Employees

MDC-Brooklyn is a high-rise jail located in Sunset Park, Brooklyn.  (GX 76, 85-86.)  In and around September 2023, MDC-Brooklyn housed approximately 1,200-1,500 federal inmates, most of whom were pretrial detainees awaiting trial or sentencing.  (Trial Tr. 953-54.)  It also employed approximately 200-300 staff members, including approximately 100 correctional officers.  (Trial Tr. 954.)

The defendant was a BOP correctional officer at MDC-Brooklyn.  As a correctional officer, the defendant was bound by policies and procedures issued by the Department of Justice ("DOJ" or the "Department"), BOP, and MDC-Brooklyn.  (Trial Tr. 956, 967 [Ramos].)

**Use of Lethal Force.**  It was longstanding policy of the Department to prohibit its employees, including BOP personnel, from using excessive force.  (GX 331.)  At the time of the shooting, the defendant was bound by a use of force policy that had been updated a year earlier.  (GX 335-A.)  That policy provided that "correctional officers of the Department of Justice may use deadly force only when necessary, that is, when the officer has a reasonable belief that the subject of such force poses an imminent danger of death or serious physical injury to the officer or to another person."  (Id. at 2.)  It also prohibited correctional officers from using deadly force "solely to prevent the escape of a fleeing suspect;" from using firearms "solely to disable moving vehicles;" and from discharging a firearm from a moving vehicle except in "exigent circumstances," in which case, the officer "must have an articulable reason for this use of deadly

6

force." (Id.) Correctional officers are not trained to shoot from moving vehicles. (Trial Tr. 403 [E. Santiago].) The use of force policy also prohibited correctional officers from firing "warning shots . . . outside of the prison context." (Id. at 3.) The defendant received a copy of the Department's use of force by email around the time it was issued. (GX 335.) He also received annual use-of-force training, including in 2023, months before the shooting. (GX 328, 329.)

**Arrest Authorities.** Correctional officers are not police officers.[1] (Trial Tr. 954 [Ramos].) By policy, they have limited arrest authorities. Under BOP policy, staff can only make warrantless arrests off BOP property for four types of crimes: (1) assault of an officer, (2) escape of a prisoner in custody, (3) instigating or arresting an escape, and (4) escape of a recalcitrant witness. (GX 307 at 20-21.) Suspected contraband smuggling was not one of the offenses for which BOP personnel could make warrantless, off-property arrests. (See id..) And even in the four instances where warrantless arrests off-property were authorized, staff could only do so when there was "probable cause to believe that the person has engaged in, or attempted to engage in," those crimes. (Id. at 19.) "Neither 'reasonable suspicion' nor 'mere suspicion' are sufficient standards by which staff may make arrests." (Id.) The defendant certified that he had received this policy and that "it [was his] responsibility to familiarize [himself] with [its] provisions." (GX 312; see also GX 313 (referencing policy).) At trial, multiple current and former BOP employees testified that they understood that BOP employees are not generally to pursue criminal suspects off MDC-Brooklyn property. (See, e.g., Trial Tr. 419 [E. Santiago], id. 829 [Walker], id. 994-95 [Ramos].)

---

[1]     As discussed in more detail below, whether the defendant was considered a "peace officer" under New York State law was the subject of debate during the charge conference. Ultimately, the defendant got the benefit of being classified as a "peace officer" in order to receive a broader and defense-friendly justification charge.

7

**Firearms.**  BOP policy provided that firearms could be used only when deemed "necessary" for certain defined "[l]aw [e]nforcement purposes," including to "[p]revent escapes" and to "[p]revent [the] loss of life or serious physical injury."  (GX 306 at 54.)  Under the policy, "escape" refers to the escape of a prisoner, not a criminal suspect.  (Trial Tr. 980 [Ramos].)  BOP staff could only use firearms after "all available means of achieving the law enforcement purpose have failed or [were] likely to fail."  (GX 306 at 54.)  In the event of an on-duty shooting, staff were required to immediately make a report, regardless of whether a BOP service weapon or personal firearm was used.  (GX 306 at 48, 60.)  This reporting obligation would trigger an after-action review process, (id., Trial Tr. 983-4 [Ramos]), which was designed to determine what, if any, changes could be made to reduce the risk of future shootings.  (Trial Tr. 952 [Ramos].)

**MDC-Brooklyn Post Orders.**  MDC-Brooklyn issued "post orders" governing the conduct of officers while on duty.  (GX 314, 315.)  Anytime there were "unusual incidents," MDC-Brooklyn personnel were expected to notify the on-duty lieutenant and command room officer and "use good judgment in decision-making." (GX 315.)  Under no circumstances were officers permitted to "leave [their] post unless [] properly relieved or instructed to do so[.]"  (Id.)  The need to stay on post was particularly important for officers assigned to a "critical posts," like perimeter officers, in order to "maintain the security of the institution."  (Trial Tr. 920-921 [Rodriguez].)  The MDC-Brooklyn post orders also required officers to generate incident and other reports.  (Id.) "Report writing [was] a critical element in correctional work."  (Id. at 921.)  At MDC-Brooklyn, perimeter posts were one of the few assignments designated as armed posts, meaning the officers were equipped with BOP-issued firearms.  (Id. at 924.)  Officers were not permitted to carry their own firearms while on duty.  (Id. at 925; Trial Tr. 413-14 [E. Santiago].)  In June 2023, the defendant acknowledged that he had reviewed his post orders.  (GX 317.)

The September 4 Shooting

On September 4, 2023, the defendant was assigned to outpost perimeter 1 ("OP1") between the hours of 12:00 AM to 12:00 PM. (GX 333 at 5.) Unlike the other two exterior perimeter postings, OP1 was designated as a "critical post" because it exclusively overlooked the facility's rear gate, an entry point into the institution. (Trial Tr. 842-43 [Walker].) OP1 was also a "walking post." (Trial Tr. 825-26 [Walker].) Officers were expected to man the post on foot, not in a vehicle. (Id.)

That night, even though he was assigned to a walking post, the defendant was driving a BOP van. (See e.g., GX 707.) Nor did he remain at OP1. (Id.) At approximately 4:35 a.m., the defendant left MDC-Brooklyn without permission and drove to a nearby subway station, where he refilled his MetroCard. (Id.; see also GX 502-B.) MDC-Brooklyn was already short one exterior staff member that evening. (GX 333 at 5.)

While the defendant was off-site, at around 4:40 a.m., a civilian BMW pulled into the MDC-Brooklyn staff parking lot, backed into an executive staff member's spot, and idled in place for several minutes. (GX 707.) The BMW's windows were tinted. (Trial Tr. 407 [E. Santiago]; GX 1-2.) The occupants of the BMW were there to smuggle marijuana, cigarettes, and cell phones to a detainee inside the facility. (Trial Tr. 485, 497 [Encarnacion].) There were three people inside the BMW, including Erick Encarnacion, who was seated in the back middle seat. (Trial Tr. 491-93 [Encarnacion]). Encarnacion, who has a developmental disability, did not have a gun. (Trial Tr. 471, 492 [Encarnacion].) Nor did Kaylyn Nunez, Encarnacion's friend, who was seated in the front passenger seat. (Id. at 492, 538.) And although Encarnacion only met the driver of the BMW earlier that evening, at no point did he see the driver holding a gun. (Id. at 492-93, 538.)

9

While the BMW idled in place in the staff parking lot, the defendant returned to the facility and parked across the street.  (GX 707.)  Ezequiel Santiago, an MDC-Brooklyn senior officer specialist with 17 years of experience (Trial Tr. 368), also observed the BMW that night.  (Trial Tr. 395 [E. Santiago].)  Unlike the defendant, Santiago was parked in the staff parking lot, just feet away from the BMW.  (Id.; see also GX 113, GX 707 at 4:42:42 AM (depicting Santiago's car).  Santiago did not see anyone exit the BMW.  (Trial Tr. 407 [E. Santiago].)  Nor were the occupants of the BMW visible.  (Id. at 408.)  The BMW's windows were tinted.  (Id. at 409; see also GX 4 (photograph of BMW).)  No rope or other object was seen coming down from the exterior of the building towards the BMW.  (Trial Tr. 409 [E. Santiago].)

After several minutes passed, the defendant drove from his parking spot across the street into the MDC-Brooklyn parking lot and brought his van to the nose of the BMW.  (GX 707.)  The BMW immediately raced out of the parking lot and off MDC-Brooklyn property.  (Id.)  The defendant had no authority to chase the BMW.  (See, e.g., GX 307; see also Trial Tr. 419 (E. "Q: What is your understanding of the authority of a Bureau prison guard to pursue someone off of the MDC? [E. Santiago]: There isn't any."), 829 (Walker: "Our jurisdiction stops at the property line."), 994-95 ("Q: So if I'm committing a crime on BOP property, correct, and I step two feet in another direction and I'm off BOP property, a CO can't arrest me, right?" [Ramos]: That's correct.").  But he gave chase anyway.  (GX 707.)  And he did so without calling for backup or even reporting the incident in real-time to a superior officer.  (Trial Tr. 932-33 [Rodriguez].)

The car chase lasted several minutes and spanned miles, stretching from the jail to the Brooklyn Bridge.  (GX 707.)  During the chase, the defendant exceeded the speed limit by at least 30 MPH, ran traffic red lights, and swerved around cars and electronic scooters.  (Id.)  Nearly a mile from the jail, the defendant narrowed the gap between his van and the BMW.  (Id.)  As the

10

cars merged onto Hamilton Avenue—a multi-lane street with two-way traffic—the defendant opened fire. ShotSpotter captured at least three bullets fired in rapid succession (GX 504-D), indicating they all originated from the same gun (Trial Tr. 449-450 [Collier]). But based on photographs of the BMW that were taken by law enforcement after the shooting, the defendant fired at the BMW at least six times. (GX 3 (depicting two bullet holes to rear of BMW); GX 7 (depicting four bullet holes to back right passenger side of BMW).)

The gunshots were to the rear exterior of the BMW. (Id.) One of the bullets pierced the trunk and back seat of the BMW and struck Encarnacion. (GX 706-C (video depicting middle seat covered in blood); GX 19; accord Trial Tr. 505 [Encarnacion].) The bullet penetrated directly to the right of his spine and lodged itself in his chest. (Trial Tr. 641-42 [Bukur]; see also GX 201 (Encarnacion medical records).) Encarnacion immediately felt a "burning pain." (Trial Tr. 505 [Encarnacion].) He then felt light-headed, had trouble breathing, and went in and out of consciousness. (Trial Tr. 505, 539 [Encarnacion]; accord GX 709 (ambulance video of Encarnacion); Trial Tr. 348 [De La Cruz].) He later made it to Bellevue Hospital for emergency surgery to treat "life threatening" injuries and survived. (GX 201; Trial Tr. 549-50 [Bukur].)

As Encarnacion bled on the back seat of the BMW, the defendant kept shooting. (Trial Tr. 505-06 ("Q: What, if anything, did you do with your body as you were feeling this? [Encarnacion]: I ducked down. Q: Why did you duck down? [Encarnacion]: Because they kept shooting.").) The defendant continued to chase the BMW down Hamilton Avenue, speeding through at least one red light, and onto the Brooklyn-Queens Expressway. (GX 707.) When the cars reached the Brooklyn Bridge, the defendant gave up the chase—the BMW fled into Manhattan while the defendant returned to MDC-Brooklyn. (Id.) During the drive back, the defendant drove calmly, this time using traffic signals and obeying lights. (GX 707.) He returned to MDC-

11

Brooklyn roughly 15 minutes after he first abandoned post.  (Id.)  The defendant's demeanor was usually "serious."  (Trial Tr. 417 [E. Santiago].)  But that night, "[w]hen [he] returned, he returned happy" and "accomplished."  (Trial Tr. 415, 417 [E. Santiago].)  According to Ezequiel Santiago, who was still in the MDC-Brooklyn staff parking lot when the defendant returned, the defendant told him, in sum and substance, that he had done a "good job," adding, "no one is going to introduce contraband in the institution, you know, we're not going to allow that."  (Trial Tr. 416 [E. Santiago].)

Even in the ensuing days, the defendant did not report the shooting to anyone at MDC-Brooklyn.  (Trial Tr. 984 [Ramos].)  It was only after the New York City Police Department ("NYPD") traced the license plate on the van to the BOP did the issue first come to MDC-Brooklyn's attention.  (Trial Tr. 840 [Walker].)  The warden subsequently ordered that all potential evidence be preserved, including the BOP van and the service firearms in use that evening.  (Trial Tr. 985 [Ramos].)  None of the ammunition was missing.  (See Trial Tr. 934 [Rodriguez]; see also Trial Tr. 1196-97 [Auteri].)  In fact, according to MDC-Brooklyn's armorer, none of the weapons had even been fired recently.  (Trial Tr. 1197-98 [Auteri].)

<u>Other Act Evidence Establishing that the Defendant Acted Willfully</u>

1.    <u>Threatening Interactions with MDC-Brooklyn Inmate Dylan Carreras in the Weeks Before the Shooting</u>

In August 2023, weeks before the September 4 shooting, the defendant approached Dylan Carreras and another MDC-Brooklyn inmate and told them that he saw a female in a silver Honda drive up to the prison, "and if she comes back again, that that little Spanish bitch will get shot in the head, and we'll be going to an early funeral."  (Trial Tr. 752, 754-756 [Carreras]).)  The defendant, resting his hand on his gun while he delivered the message, told Carreras and the other

inmate that he knew the contraband smuggling was connected to them.  (Trial Tr. 755-56 [Carreras].)

A few weeks later, the defendant confronted Carreras about contraband in a garbage can.  (Trial Tr. 757.)  When the defendant mentioned his gun, Carreras responded that "the gun is real, but them bullet in that shit is fake.  And you ain't shooting nobody.  That shit fake." (Trial Tr. 757-58.)  The defendant then "took the firearm out . . . it was pointed towards the floor.  He cocked it back, and the bullet came out.  Picked the bullet back up and put it in his pocket." (Trial Tr. 758.)

Stop-And-Frisk and False Report on September 5, 2023

The night after the shooting, on September 5, 2023, the defendant was assigned to outpost perimeter 2 ("OP2") between the hours of 12:00 AM to 12:00 PM.  (GX 334 at 5.)  While on duty, the defendant—again driving a BOP vehicle—pursued a pedestrian off MDC-Brooklyn property and proceeded to stop-and-frisk him.  (GX 700.)  The defendant recovered contraband from the pedestrian.  (Id.)  The defendant then prepared and filed a report describing the encounter. (GX 336.)  However, in his report, the defendant suggested that he recovered the contraband on MDC-Brooklyn property, near the staff parking lot.  (Id.)  An investigative officer at MDC-Brooklyn was assigned to investigate the incident and concluded that the defendant's report was false.  (Trial Tr. 829.)[2]

---

[2]    At the end of trial, the Court specifically instructed the jury that other act evidence could only be used "solely for the purpose of showing that the -- what the Defendant's state of mind was at the time of the September 4, 2023 incident that forms the basis of the charges against him, i.e., to assist you in determining whether the Defendant acted knowingly, intentionally, willfully, and/or with a particular motive with respect to the charged offenses and not due to mistake, accident, or other innocent reasons." (Trial Tr. 1408-09.)

Case 1:24-cr-00465-PKC    Document 77    Filed 03/16/26    Page 22 of 53 PageID #: 1159

Other Evidence Concerning Contraband Smuggling at MDC-Brooklyn

The trial featured other evidence about contraband smuggling and other risks posed facing MDC-Brooklyn personnel.  For instance, a correctional officer testified that contraband smuggling was an issue plaguing MDC-Brooklyn around the time, explaining, "We had been having attempts of introduction of contraband and it was just repeatedly night after night, night after night." (Trial Tr. 424 [E. Santiago].)  An MDC-Brooklyn investigator testified that there are procedures at MDC-Brooklyn to ensure that suspected contraband smugglers are prevented from visiting the jail in the future.  (Trial Tr. 830 [Walker].)  And MDC-Brooklyn's former captain testified about different types of contraband, including weapons, cell phones, and drugs, any one of which, the captain testified, "could be a threat to the institution." (Trial Tr. 946-48 [Rodriguez].)

Defendant's Testimony

The defendant testified in his own defense.  On direct examination, the defendant testified that even though he was parked across the street from the staff parking lot and the BMW was "heavily tinted," he was able to see multiple occupants in the car using a cell phone, with one person holding the phone to his ear.  (Trial Tr. 1055.)  He then observed a "dark … really thin" rope, even though it was nighttime, and concluded it was a "possible escape." (Trial Tr. 1055.) The defendant claimed he made a "split decision" and "decided to follow the escape procedures." (Trial Tr. 1058.)  During the pursuit, according to the defendant, his radio "flew from where I had it into the passenger's side." (Id.)  He said he was never able to recover it because he was "too high up." (Trial Tr. 1059.)

Roughly six blocks into the pursuit, the defendant claimed that he pulled up to the BMW because it was blocked by another car,[3] and observed four total occupants inside the car,

---

[3]     This supposed encounter was not captured by the extensive surveillance video depicting the car chase.  (GX 707.)

14

including a female driver. (Trial Tr. 1059-60.) The defendant testified that he tried to take a video of the car but the facial recognition feature on his phone suddenly stopped working, preventing him from unlocking his device. (Trial Tr. 1059.) As the chase continued, according to the defendant, the BMW deliberately slowed down, and a gun emerged from the rear driver's side window. (Trial Tr. 1062.) The defendant says he then quickly reacted: "I immediately dropped the phone, transferred my service weapon to my left hand and engaged a threat, pulling from left to right." (Id.) After firing on the BMW (the defendant said he did not remember how many) the defendant claimed he went into "shock." (Trial Tr. 1062.) At that point, he "wasn't following the BMW," but "was just driving." (Trial Tr. 1063.) When the defendant came to the Brooklyn Bridge, he realized he was driving in the wrong direction and returned to MDC-Brooklyn. (Trial Tr. 1064.)

Cross-examination revealed numerous inconsistencies with the defendant's account. For instance, at one point during cross-examination, the defendant indicated that he did not recall whether the windows in the BOP van were up or down. (See Trial Tr. 1132.) But later, when confronted with the fact that he had not shot through the BOP van's windshield or window in response to a supposed imminent threat (as is standard law enforcement practice) (Trial Tr. 1156), the defendant testified that he conveniently had put his window down back at "block six." (Trial Tr. 1157.) The defendant and government attorney then had the following exchange:

> Prosecutor: Why did you put your window down?
>
> Defendant: Why did I put my window down?
>
> Prosecutor: Yeah, why did you put your window down?
>
> Defendant: Because I wanted to.

(Trial Tr. 1157.)  The defendant added, "I wanted to make sure my window was down at the beginning of the stuff, so I put my window down."  (Trial Tr. 1158.)

Later, the defendant was asked to walk the jury through the different steps he would have needed to take to get off at least six shots in an emergency situation—react to seeing a gun, drop his phone, unholster his weapon from his right hip using his right hand, and switch the weapon to his left hand—all while driving a car that was merging with traffic and switching lanes at the same time.  (Trial Tr. 1157-58.)  The defendant resisted the questions and described the entire process as "[p]retty basic stuff."  (Trial Tr. 1158.)  The defendant denied that, after the shooting, he was even chasing the BMW (Trial Tr. 1160), even though surveillance footage depicted otherwise (GX 707).  And the defendant was confronted about his testimony that he saw the BMW's occupants.  The defendant testified that he was "[a]bsolutely[] 100 percent" certain that he observed four people inside the BMW because the GPS made it possible for him to see inside the car (tinted windows and all).  (Trial Tr. 1144-45.)  But in a voice note the defendant sent to a friend, the defendant said, "I didn't even know how many motherfuckers was in that car.  It could have been motherfucking two.  It could have been three.  I don't fucking know."  (GX 829.)

At various points during the direct examination of the defendant, he improperly commented on the testimony of other witnesses.  (Trial Tr. 1060 ("Q: You heard Erick Encarnacion testify last week that Kaylyn Nunez [sic] male friend was the driver, correct? [Defendant]: Yes. Q:  Do you disagree with his testimony? [Defendant]:  I disagree.  I also heard him say she backed into the wall before he changed his statement."); see also Trial Tr. 1045 (commenting on Walker's testimony), 1064-65 (commenting on Ezequiel Santiago's testimony).  Commenting on Dylan Carreras' trial testimony, the defendant testified that he had "no idea what he was talking about," and claimed that "[he] would have been notified immediately" by MDC-Brooklyn personnel had

16

the incidents between him and Carreras actually occurred, since those are allegations the jail takes seriously. (Trial Tr. 1034-35.) In rebuttal, the government re-called an MDC-Brooklyn special investigative agent, who testified that Carreras' allegations had in fact been reported to MDC-Brooklyn and later to the DOJ Office of the Inspector General ("DOJ-OIG"). (Trial Tr. 1206-07.) Officers referred to DOJ-OIG referrals are not made aware of those referrals. (Trial Tr. 1207.)

Charge Conference

Justification Jury Instruction

On September 29, 2025, the parties submitted their proposed jury instructions, neither of which requested a justification instruction. ECF Nos. 36 and 38. On October 23, 2025, after the jury was dismissed for the day, the Court, on its own, asked the parties to submit proposed instructions on justification, (Trial Tr. 1001), which the parties did. (ECF Nos. 48-49.)

The parties agreed that under Second Circuit law, the Court needed to look to state law for the justification charge. (Trial Tr. 1223, ECF Nos. 48-49.) See United States v. Desinor, 525 F. 3d 193, 199 (2d Cir. 2008); see also United States v. Davis, 531 Fed. Appx. 65 (2d Cir. 2013). The defendant asked that the justification charge principally be taken from New York State Penal Law § 35.30 ("the Expanded Justification"), which permits peace officers and police officers to use force, and specifically lethal force, in certain circumstances related to their role as a law enforcement officer above and beyond circumstances in which a civilian may use lethal force in self-defense. (ECF No. 48; Trial Tr. 1211.) Section 35.30 authorizes:

> A police officer or a peace officer, in the course of effecting or attempting to effect an arrest, or of preventing or attempting to prevent the escape from custody, of a person whom he or she reasonably believes to have committed an offense, may use . . . deadly physical force [to the extent he reasonably believes such force to be necessary to effect the arrest, or to prevent the escape from custody] . . . only when he [] reasonably believes that (a) [t]he offense committed by such person was: (i) a felony or an attempt to commit a felony involving the use or attempted use or threatened

17

> imminent use of physical force against a person; or . . . (c) . . . the use of deadly physical force is necessary to defend the police officer or peace officer or another person from what the officer reasonably believes to be the use or imminent use of deadly physical force.

(See ECF No. 48, Trial Tr. 1212-15.)  The defendant further proposed inapplicable additional language based on other New York state and city statutes for circumstances in which law enforcement officers are permitted to use force (i.e., the ability to use force "to quell a disturbance" or "to maintain order").  (ECF No. 48; see also Tr. 1212-14.)

The government proposed that the Court instead craft a justification instruction using New York State Penal Law § 35.15 ("the Standard Justification").  Section 35.15 does not depend on whether one is a "peace officer."  Rather, that law entitles any individual to use deadly physical force upon another when, and to the extent that, he reasonably believes it to be necessary to defend himself or someone else from what he reasonably believes to be the use or imminent use of unlawful deadly physical force by such individual.  (ECF No. 49.)

On October 27, 2025, the Court held a charge conference outside the presence of the jury and discussed the justification charge at length.  (Trial Tr. 1208-93.)  Largely at issue was whether the defendant was entitled to the Expanded Justification charge in addition to the Standard Justification charge.  Because of the defendant's request to charge the jury on the Expanded Justification, the Court heard arguments on whether there was a view of the evidence that the defendant was authorized to make an arrest, and if so, if there was a reasonable view of the evidence that he was preventing or attempting to prevent an escape from custody.  (Trial Tr. 1212-23.)

18

The defendant argued that the Expanded Justification applied given his status as a corrections officer,[4] and because there was a reasonable view of the evidence in the light most favorable to the defendant that he was attempting to prevent an escape. (Trial Tr. 1211, 1214, 1216.) The government argued that the Expanded Justification charge was not appropriate, since (i) the defendant was not authorized to make an arrest when he shot the victim, and (ii) there was no reasonable view of the evidence that the defendant was preventing an escape from custody. (Trial Tr. 1215; 1217-23.) The Court indicated that it agreed with the government: it did not believe the defendant was authorized to make an arrest, and there was not a "sufficient factual basis" in the record that the defendant acting to prevent an escape from custody. (Trial Tr. 1218.)

At various points during the charge conference, the Court suggested that it agreed with the government that the defendant was not authorized to make an arrest, and that there was not a "sufficient factual basis" in the trial record to indicate that the defendant believed he was trying to prevent an escape from custody on September 4, 2023. (Trial Tr. 1215-18, 1223, 1272-73; see also Trial Tr. 1248; 1267-69.) Nevertheless, in order to give the defendant the most defense-friendly jury charge, (see Trial Tr. 1212-13, 1266-67, 1270, 1278) (indicating the Court's preference to accommodate the defendant), the Court elected to leave it to the jury to determine those facts. (Trial Tr. 1278-79.) The Court therefore granted the defendant's request and delivered

---

        [4]      The defendant's proposed instruction interchanged the words "corrections officer" for "peace officer." During the charge conference, defense counsel initially asserted that there was testimony in the record that a corrections officer was a peace officer. (See Tr. 1216 ("35.30 states a police officer or a peace officer, which we have testimony that a correction officer is a peace officer"); see also Tr. 1274.) After reviewing the transcript, the parties and the Court determined that there was no record evidence establishing that the defendant was a peace officer so as to entitle him to the Expanded Justification Charge. (Tr. 1274-78.) But as discussed below, the Court gave the defendant of that charge anyways, at his request and for his benefit.

19

both the Standard Justification and Expanded Justification charges, permitting the jury to find that the defendant was justified under either theory.  (Trial Tr. 1418-23.)

Uncalled Witnesses Equally Available Jury Instruction

The defendant objected to including an uncalled witnesses equally available instruction on the basis that Kaylyn Nunez, who had criminal exposure for contraband smuggling, was not equally available because the defendant could not immunize her.  (Trial Tr. 1227.)  The government responded that the defense had made a "tactical" decision not to call Nunez because they knew, based on her Jencks Act material, that she would have corroborated Encarnacion's testimony that there was no gun in the BMW.  (Trial Tr. 1230.)

The Court overruled the defendant's objection.  (Trial Tr. 1235.)  The Court reasoned that it "would be misleading, if not unfair, to let the defense take advantage of her not being called when, in fact, she could have been available to them."  (Id.)  Nunez was not on the government's witness list.  (Trial Tr. 1234.)  The Court observed that it might have ruled differently had the defendant made any effort to call her, but "to now try to take advantage of that decision in a way to suggest the Government should have called her is, I think, is inappropriate."  (Id. at 1235.)

During the charge conference, the Court cautioned the parties to be careful about what they argued in summations so as not to create a "changed circumstance" requiring the Court to "address" improper arguments.  (Trial Tr. 1238.)

Defense Counsel's Improper Closing Argument About Carreras Testimony, Prompting the
  Need for Supplemental Jury Instruction

The defense made multiple improper arguments to the jury in summations.  It argued, for instance, that Dylan Carreras was not credible, because the government did not produce video footage evidence depicting his encounters with the defendant.  (Trial Tr. 1352 ("if Leon

20

Wilson displayed a gun in the outer perimeter or anywhere in the MDC to Dylan Carreras, I submit to you that there's video of this somewhere."). Defense counsel also defied the Court's warning about making improper arguments about equally available uncalled witnesses, telling the jury:

> I want you to be fair and impartial jurors, but you should expect the government to answer some of these questions at least: Who is the occupant, the third occupant of the BMW? Where is that person? What type of gun did Kaylyn Nunez own? **Where is she?** You have her car. You have her friend Erick. You have her address. You also have the burden of proof. **You may hear how Kaylyn Nunez was available to the defense but they chose not -- the government has the burden of proof. They always do. It never shifts to the defense. They have the burden of proving guilt beyond a reasonable doubt. Why wasn't she called as a witness**? You gave immunity to Carreras and Encarnacion. You could have given Nunez immunity too.

(Trial Tr. 1365 (emphases added).)

After summation, the Court addressed defense counsel's improper call for speculation about the existence of MDC-Brooklyn surveillance footage depicting the defendant's encounter with Carreras. The Court concluded that it was its intention to add a new sentence to the jury charge cautioning the jury not to speculate about whether surveillance video exists or what it might have shown. (Trial Tr. 1385-86.) The defendant objected, claiming it was "unnecessary, [and] superfluous." (Trial Tr. 1386.) But the Court disagreed. Citing its obligation to serve as a neutral gatekeeper, the Court made clear that the argument was improper and invited a curative instruction asking the jury not to speculate. (Trial Tr. 1386-87.) The Court also reminded the defense that it was previously warned about making improper arguments to the jury about absent evidence or witnesses:

> You're inviting some instruction, so I can reinforce with the jury that they should not speculate as to other evidence that exists out there and why it wasn't produced at this trial. Same thing with witnesses. We obviously had that whole discussion about the uncalled witnesses instructions, which I think is very appropriate

21

here, given how the argument went.  So I am going to include that sentence.

(Trial Tr. 1387.)

The Court ultimately instructed the jury in accordance with the Court's draft instructions, see ECF No. 47, and as discussed in the charge conference, but added two sentences, emphasized below:

> Although the government bears the burden of proof beyond a reasonable doubt, and although a reasonable doubt can arise from [] lack of evidence, you are instructed that there is no legal requirement that the government use any specific investigative techniques or pursue every investigative lead to prove its case. Therefore, although you are to carefully consider the evidence adduced by the government, you are not to speculate as to why it used the techniques it did or why it did not use other techniques.
>
> Additionally, the law does not require that all things mentioned during the course of the trial be produced as exhibits. **In addition, you heard argument about how other evidence had to exist, such as surveillance video, but was not introduced at this trial.  You are not to speculate about whether any such evidence exists or what it might have shown.** Your concern is to determine whether or not, based on the evidence or lack of evidence presented at this trial, the [d]efendant's guilt has been proved beyond a reasonable doubt.
>
> In this regard, I also charge you that all persons who may have been present at any time or place mentioned in the case, or who may appear to have some knowledge of the issues in this case, need not be called as witnesses.

(ECF No. 51; Trial Tr. 1402-03 (emphasis added).)  While the defendant objected to the supplemental inclusion of the two sentences emphasized above, he did not object during the charge conference to the remainder of the instruction. (See Trial Tr. 1223-38.)

22

Jury Deliberations

The jury was charged on October 28, 2025.  After deliberating for several hours that day and issuing four jury notes, see ECF No. 53, the jury returned guilty verdicts on both counts.  The defendant was remanded on November 21, 2025.

LEGAL STANDARDS

I.      Rule 33

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  See Fed. R. Crim. P. 33(a).  The Second Circuit has held that "[g]enerally, a motion for a new trial 'should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'"  Smith v. Carpenter, 316 F.3d 178, 183 (2d Cir. 2003) (quoting Atkins v. New York City, 143 F.3d 100, 102 (2d Cir. 1998)).  "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33," United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009), and the crucial question for the court is whether "it would be a manifest injustice to let the guilty verdict stand."  United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992) (citation and internal quotation marks omitted).  A "manifest injustice" occurs where a trial court cannot be satisfied that "competent, satisfactory and sufficient evidence" supports the jury's finding of guilt beyond a reasonable doubt, and where a "real concern" exists "that an innocent person may have been convicted."  Id.

Rule 29

Rule 29 provides that the Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  The defendant "bears 'a very heavy burden'" when seeking acquittal.  United States v. Rosenthal, 9 F.3d 1016, 1024 (2d Cir. 1993) (quoting United States v. Rangosta, 970 F.2d 1085, 1089 (2d Cir.

23

1992)).  The Court "must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Aguiar, 737 F.3d 251, 264 (2d Cir. 2013) (quoting United States v. Writers & Research, 113 F.3d 8 (2d Cir. 1997)).

The Court may "not usurp the role of the jury." United States v. Jabar, 19 F.4th 66, 76 (2d Cir. 2021); see also United States v. Desena, 260 F.3d 150, 154 (2d Cir. 2001) (noting that the Court must "resolve all issues of credibility in favor of the jury's verdict" (quoting United States v. Reyes, 157 F.3d 949, 955 (2d Cir. 1998))).  "It is irrelevant" whether the Court "personally feels" that, as the factfinder, it "would not have found guilt upon such evidence." United States v. Espaillet, 380 F.3d 713, 718 (2d Cir. 2004).  And the Court must "view the evidence in the light most favorable to the Government with respect to each element of the offense." United States v. Artuso, 618 F.2d 192, 195 (2d Cir. 1980) (citation and internal quotation marks omitted); see also United States v. Rosa, 17 F.3d 1531, 1542 (2d Cir. 1994) (requiring trial courts to "credit every inference that could have been drawn in [the government's] favor").

"While 'a conviction based on speculation and surmise alone cannot stand,' 'the jury's verdict may be based entirely on circumstantial evidence' and may be 'inferred' from the evidence, so long as the inference is reasonable, for 'it is the task of the jury, not the court, to choose among competing inferences.'" United States v. Morgan, 385 F.3d 196, 204 (2d Cir. 2004) (citations omitted).  "The evidence need not eliminate every possible theory of innocence," and the Court "must consider pieces of evidence not in isolation, but in conjunction." Rosenthal, 9 F.3d at 1024.  "[W]here 'either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter.'" Morgan, 385 F.3d at 204 (quoting United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000)).

24

<u>ARGUMENT</u>

The defendant claims he is entitled to a new trial due to "cumulative prejudice" from the admission of § 404(b) evidence, "asymmetric evidentiary rulings" favoring the government, and erroneous jury instructions, including the Court's justification instruction. Def. Mot. at 2. He also seeks a judgment of acquittal on the grounds that the government failed to prove willfulness under Count One. And he purports to preserve the argument on appeal that § 242 does not categorically qualify as a crime of violence under § 924(c)(3)(A).

None of these claims has merit. The admission of § 404(b) evidence was appropriate under the facts of the case and the government's heightened burden to prove willfulness under Count One. The Court's jury instructions were proper, including its justification instruction, which the defendant specifically requested. There was ample evidence—from the outrageous nature of the conduct, to the extensive training, to the post-shooting acts of concealment—to conclude that the defendant acted willfully. And § 242 is a valid predicate under § 924(c).

The motions should be denied in their entirety.

## I.    <u>The Defendant's Rule 33 Motion Should Be Denied</u>

<u>The Court's Evidentiary Rulings Were Correct</u>

### 1.    <u>The Court Properly Admitted the Carreras Testimony, Which Was Highly Probative of Willfulness and Not Unduly Prejudicial</u>

The defendant first argues that the Court's decision to admit Carreras's testimony was improper because, he claims, that evidence amounted to "propensity proof in sheep's clothing." Def. Mot. at 7. Not so. The Court properly admitted Carreras's testimony under Rule 404(b). It was highly probative of the defendant's intent and whether he acted willfully, and it

was not unduly prejudicial.[5]  See Fed. R. Evid. 404(b)(2); see also United States v. Mickens, 926 F.2d 1323, 1328 (2d Cir. 1991) (to admit 404(b) evidence, a trial court must determine that the evidence is offered for a purpose other than to prove the defendant's bad character or criminal propensity, that the evidence is relevant under Rules 401 and 402 of the Federal Rules of Evidence and that its probative value is not substantially outweighed by the danger of unfair prejudice).

The Court's decision was consistent with a long line of § 242 cases holding that other act evidence is admissible to establish willfulness.  See, e.g., United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999) (in § 242 prosecution, affirming decision to admit, pursuant to Rule 404(b), evidence that the defendant had choked another arrestee in the past "because it was relevant to rebut [the defendant's] assertion that he choked [the victim] unintentionally"); United States v. Krug, No. 15-CR-157-A, 2017 WL 907817, at *2 (W.D.N.Y. Mar. 8, 2017) ("Put simply, the Supreme Court's interpretation of the word 'willfully' in § 242 opens the door to a variety of evidence that might make the Defendant's intent 'more . . . probable.'"); United States v. Cowden, 882 F.3d 464, 473 (4th Cir. 2018) (in § 242 prosecution, admitting two prior bad acts part on "the government's heavy proof burden"); United States v. White, 68 Fed. App'x 707, 710-11 (7th Cir. 2003) (in § 242 prosecution, affirming admission of other-acts evidence to prove willfulness because the other-acts evidence "demonstrated . . . that [the defendant] was on notice that the use of unnecessary force under color of law is illegal and, more specifically, that unreasonable force in response to non-threatening verbal comments was in excess of his authority"); United States v. Boone, 828 F.3d 705, 711 (8th Cir. 2016) (in § 242 prosecution, concluding that "[e]vidence of

---

[5]    The defendant claims that the Court "reconsidered" its 404(b) ruling mid-trial. (Def. Mot. at 2.)  While the Court noted that it recognized some "propensity concern" raised by the evidence than it had not initially appreciated, it then went on to affirm—not reconsider—its pre-trial ruling that this concern did not "outweigh[] the probative value of establishing willfulness, which is the Government's burden." (Trial Tr. at 1021.)

[the defendant's] use of unreasonable force against [one victim of prior bad act] was relevant to prove that [the defendant] acted willfully when he deprived [the victim of charged offense] of his right to be free from unreasonable force."); United States v. Brugman, 364 F.3d 613, 620 (5th Cir. 2004) (in § 242 prosecution, affirming admission of bad act evidence and observing, "[b]ecause the crime for which [the defendant] was charged has as an element an intent requirement, [the defendant's] intent was at issue, and the admission of extrinsic evidence could therefore be relevant to prove intent."); United States v. Rodella, 804 F.3d 1317, 1334 (10th Cir. 2015) (in § 242 prosecution, affirming admission of bad act evidence and observing, "the government sought admission of evidence of the other three similar acts to assist in proving willfulness, which was an essential element of the 18 U.S.C. § 242 charge.").

Here, as in Livoti, the § 404(b) evidence was especially relevant because the defendant's self-defense claim directly challenged the government's evidence of his state of mind. See Livoti, 196 F.3d at 326. In making its pre-trial ruling, the Court recognized as much:

> But I also think the Government does have the right, and obviously they have the obligation, to try to bring to bear all competent admissible evidence to prove every element. And that includes willfulness, which is obviously a key element here because, as [defense counsel] sa[id], officers are given a certain amount of authority to use violence or other means to stop illegal activity. But the Government has to show here that the defendant knew he wasn't supposed to be doing what he was doing. And these statements go directly to his state of mind right around the time frame and in two different incidents.

(PTC Tr. 10-11.)

The defendant tries to distinguish Livoti by arguing that "the Carreras evidence does not rebut a specific, element-linked claim." Def. Mot. at 8. But that is wrong. Willfulness was an element of the offense. And more than that, it was the central disputed issue at trial: if, as the defendant claimed to the jury, the defendant instinctively acted in self-defense the moment a

27

gun was turned on him, he necessarily did not act willfully to deprive Erick Encarnacion of his constitution right to be free from unreasonable force. As a result, the Second Circuit's reasoning in Livoti applies squarely in this case: just as evidence of the previous choking was admissible "to rebut Livoti's assertion that he choked [the present victim] unintentionally," Livoti, 196 F.3d at 326, here, the defendant's escalating threats to Carreras about contraband smuggling—including his explicit promise to put a bullet in a suspected smuggler's head—was admissible to counter his claim that he shot at the BMW in self-defense.

The defendant also incorrectly asserts that the Carreras evidence was "more viscerally inflammatory than the charged conduct[.]" Def. Mot. at 8. As the Court observed during the pre-trial conference, making verbal threats and even discharging the bullet of a gun onto the floor is far less inflammatory than the charged conduct of shooting a gun multiple times at a vehicle and gravely injuring one of the vehicle's passengers. (See PTC Tr. at 17 (describing Carreras incidents as "less severe"). Just like in Livoti, then, the probative value of the August 2023 incidents outweighed any prejudicial effect. See 196 F.3d at 326.

Finally, and contrary to the defendant's claims, any potential prejudice was effectively mitigated by the Court's cautionary instruction limiting the jury's consideration of the evidence to the question of "whether the Defendant acted knowingly, intentionally, willfully, and/or with a particular motive with respect to the charged offenses and not due to mistake, accident, or other innocent reasons." Trial Tr. 1408-1409; see also Livoti, 196 F.3d at 326; Mickens, 926 F.2d at 1328-29. The defendant never raised any objection to this instruction, either during the charge conference or when the Court charged the jury. And though the defendant now asserts that the jury "could not follow the instruction because the instruction was internally

28

contradictory," Def. Mot. at 9, in fact, the Court's instruction was clear.  The Court explicitly

instructed the jury on what it could <u>not</u> do with the evidence:

> [Y]ou may not consider the evidence of those other acts as a substitute for proof that the Defendant has a criminal propensity -- personality or bad character. You also may not consider this other act evidence to conclude that the Defendant has some propensity to commit crimes, or that if he committed a similar act in the past, he must also have committed the crimes charged in the indictment. The evidence of other acts was admitted for a much more limited purpose and you may consider it only for that limited purpose.

(Trial Tr. 1409.)  This instruction was more than sufficient to mitigate the risk of any prejudice

from the Carreras evidence.  The Court should deny the defendant's motion.

<u>The Cumulative Effect of the Carreras Testimony and the September 5 Report was Not Unduly
Prejudicial</u>

For the reasons set forth above, the defendant cannot show that the Court's decision

to admit the Carreras evidence was error.  But even if he could, he has not articulated any basis for

his next claim: that the combination of that decision with the Court's other, valid evidentiary

rulings—specifically the Court's decision to admit evidence of the September 5 false report—

unfairly influenced the jury.  <u>See</u> Def. Mot. at 9-10.

Although the defendant does not dispute that evidence of the September 5 false

report was both admissible and properly admitted here, he argues that the "cumulative effect" of

the Court's error in admitting the Carreras evidence combined with the evidence of the September

5 report requires a new trial under <u>United States v. Zhong</u>, 26 F.4th 536, 551 (2d Cir. 2022).  <u>See</u>

Def. Mot. at 10.  This argument reflects a fundamental misunderstanding of <u>Zhong</u>, which

examined the cumulative effect of multiple *erroneous* evidentiary rulings.  <u>See</u> <u>Zhong</u>, 26 F.4th at

588 ("'the cumulative effect of a trial court's errors, even if they are harmless when considered

singly, may . . . requir[e] reversal' or vacatur of a conviction") (alterations in original) (quoting

United States v. Al-Moayad, 545 F.3d 139, 178 (2d Cir. 2008)).  Even by the defendant's own argument, there simply was no cumulative effect of multiple erroneous 404(b) rulings in this case.

Moreover, the addition of evidence of the September 5 Report was not unfairly prejudicial under Rule 403.  Like the Carreras evidence, the September 5th conduct—intercepting contraband off MDC-Brooklyn property and then lying about it afterwards—was far less inflammatory than the charged shooting.  In fact, defense counsel seized upon the September 5th evidence during summations, arguing that it illustrated that the defendant was someone who treats people with "respect" and is an example of "a corrections officer who did his job."  (Trial Tr. 1350.)  Whatever prejudice the September 5th evidence posed (if there was any), any prejudicial impact was mitigated by the Court's limiting instruction.

The Court Gave the Defendant Substantial Latitude to Offer Evidence and Make Arguments About MDC-Brooklyn

The defendant next claims that the Court's evidentiary rulings created an evidentiary "imbalance," because the government was permitted to introduce evidence of the defendant's focus on contraband but the defendant was precluded "from showing the fixation was a reasonable response to a genuine institutional crisis," and thereby "explain why Wilson perceived the BMW as a threat and why he acted without waiting for backup."  Def. Mot. at 12.  This argument fails, for two reasons.

First, the Court's pre-trial ruling to preclude the defendant from introducing generalized evidence about work conditions and contraband smuggling was correct.  As the Court properly found, the conditions *inside* MDC-Brooklyn – including the scope and frequency of contraband smuggling to the institution – simply were not relevant to the question of whether the defendant reasonably shot at the BMW after chasing it *outside* MDC-Brooklyn and through the streets of Brooklyn.  Instead, the defendant's proposed evidence risked inviting jury nullification

30

based on sympathy for the defendant and his generalized work conditions rather than on judgment of his conduct.  See United States v. Paccione, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming district court's exclusion of evidence because it "could well cause the jury to be influenced by sympathies having no bearing on the merits of the case").  The Court was right to exclude that evidence.

Second, and contrary to the defendant's claims, there was significant evidence and argument at trial about the problem of contraband smuggling and related conditions at the MDC. During the government's case, the jury heard about "attempts of introduction of contraband and it was just repeatedly night after night, night after night," (Trial Tr. 424), the procedures used by MDC-Brooklyn to prevent contraband smuggling (Trial Tr. 830), and different types of contraband introduced into the institution, including weapons, cell phones, and drugs, any one of which, an MDC-Brooklyn captain testified, "could be a threat to the institution" (Trial Tr. 946-47).

The defendant did not spare any opportunity to put the issue of contraband smuggling before the jury.  In its opening statement, counsel (improperly) described MDC-Brooklyn as "one of the most dangerous detention centers in the United States," and said it "has a building full of inmates that are smuggling contraband, drugs, and weapons from the outside." (Trial Tr. 281).  Throughout trial, defense counsel cross-examined numerous witnesses about contraband at MDC-Brooklyn.  See, e.g., Trial Tr. 421-422, 424 (Ezequiel Santiago); 536 (Erick Encarnacion); 764, 766-767 (Dylan Carreras); 946-947 (Carlos Rodriguez); 991-93 (Ramos).  And during his own testimony, the defendant spoke at length about contraband at MDC-Brooklyn.  He told the jury that his duties as a corrections officer were "[t]o protect the institution from any escape, contraband, any sorts of disturbances."  (Trial Tr. 1027.)  He recounted how he previously discovered and prevented contraband from being smuggled into the jail (Trial Tr. 1031), including

31

when he recovered contraband during the September 5 stop and frisk (Trial Tr. 1039-1046). And

during summations, defense counsel spoke at length about contraband at MDC-Brooklyn:

> The only thing that [the defendant] was certain of was that his job
> was to guard the MDC against threats against the institution such as
> escape or the smuggling of contraband into the facility.
>
> Now, as Officer Santiago, a government witness, told you, and Leon
> told you, for weeks preceding that morning, there had been
> numerous successful and unsuccessful attempts to smuggle
> contraband into the MDC from that staff parking lot.
>
> As Captain Rodriguez told you, smuggled contraband poses a threat
> to a prison, even if the contraband is something inherently safe like
> a cell phone. Cell phones can be used to arrange for additional
> smuggling or to plan an escape or for something else, but as Captain
> Rodriguez, the government witness, told you, even as something as
> harmless as a cell phone is a threat to the institution.

(Trial Tr. 1345-46.)

Throughout his closing argument, the defendant made the exact argument that he

now claims the Court precluded him from making. Describing the moments before the

defendant shot his weapon on September 4, counsel argued:

> This is where your training kicks in. You don't think what do the
> rules and regulations of the BOP tell me to do now. I can be
> pursuing someone who's dangerous, someone who's armed,
> someone who escaped or someone who has contraband in the
> vehicle. You know, contraband is not limited to phones, marijuana
> or cigarettes. Contraband can also be weapons.
>
> Split second decision. Early morning. High rate of speed through
> the streets of Brooklyn. No lights on, no sirens on, because the van
> wasn't equipped with lights and sirens. Not knowing what he was
> going to encounter, he could have stopped, but that's not how
> Leon's built. He's a soldier and he's a great correctional officer.
> His whole life is to protect and serve and he wasn't going to stop on
> September 4, 2023, and that's exactly what he was doing.

(Trial Tr. 1355-1356.) The Court should reject the defendant's claims that he was precluded

from making arguments about the conditions at the MDC, which are contradicted by the record.

32

<u>The Defendant's Challenges to the Jury Instructions Are Without Merit</u>

       1.      <u>The Defendant Cannot Complain About the Very Justification Charge He Sought</u>

The defendant contends that the Court erred in delivering the Expanded Justification Charge, which left for the jury, rather than the Court, to decide whether the defendant was permitted to make an arrest off MDC-Brookyln property. Def. Mot. at 13-14. As explained above, during the charge conference, the defendant invited this supposed "error" by asking the Court to give the Expanded Justification Charge in the exact formulation it was given. (ECF No. 48; Tr. 1211, 1269-1270.) He thus has waived any claim of error. But even on its merits, the defendant's claim should fail.

       i.      <u>The Defendant Waived Any Challenge to the Justification Charge</u>

The concepts of waiver and invited error are largely discussed in the context of appellate review, but the principles are relevant here.[6] <u>See</u> <u>United States v. Williams</u>, 930 F.3d 44, 64-65 (2d Cir. 2019) (discussing that waiver extinguishes a claim, foreclosing appellate review). Waiver is the "intentional relinquishment or abandonment of a known right." <u>United States v. Olano</u>, 507 U.S. 725, 733 (1993) (citation and internal quotation marks omitted). "A finding of true waiver applies . . . [when] defendants not only failed to object to what they now describe as error, but they actively solicited it." <u>United States v. Quinones</u>, 511 F.3d 289, 321 (2d Cir. 2007). In <u>Williams</u>, the Second Circuit explained that:

> [a] claim is waived . . . when a defendant makes an 'intentional decision not to assert a right,' or put another way 'act[s] intentionally in pursuing, or not pursuing, a particular course of action.' <u>United States v. Spruill</u>, 808 F.3d 585, 597 (2d Cir. 2015). And our caselaw makes clear that an identifiable tactical

---

     6     <u>See</u> <u>United States v. Boyle</u>, No. S1 08 CR 523 (CM), 2010 WL 4457240, at *10 (S.D.N.Y. Oct. 27, 2010), <u>aff'd</u>, 452 F. App'x 55 (2d Cir. 2011) (applying the invited error doctrine to a Rule 33 motion).

> benefit is not a 'prerequisite to identifying waiver where the totality of circumstances otherwise demonstrate the requisite intentional action.' Id. at 599.

Williams, 930 F.3d at 64-65.  In the context of jury instructions, "if a party invited the charge or affirmatively waived his position, [he] has waived any right to appellate review of the charge." United States v. Giovanelli, 464 F.3d 346, 351 (2d Cir. 2006) (citation and internal quotation marks omitted); see also United States v. Young, 745 F.2d 733, 752 (2d Cir. 1984) ("[N]ot even the plain error doctrine permits reversal on the ground that the trial court granted a defendant's request to charge."); see also Spruill, 808 F.3d at 596-97 (collecting cases involving the "[v]arious circumstances [that] can manifest a defendant's intentional relinquishment of a known right," and, thus, constitute waiver).  Indeed, as noted in United States v. Hertular, 562 F.3d 433 (2d Cir. 2009), when a defendant "not only fail[s] to object to the challenged charge," but also "specifically endorse[s]" the instruction, "[s]uch endorsement might well be deemed a true waiver, negating even plain error review."  Id. at 444 (citations and internal quotation marks omitted); United States v. Ferguson, 758 F.2d 843, 852 (2d Cir. 1985) (observing, in discussing "invited error," that when defendants obtain "precisely what they affirmatively sought, it ill behooves [them] now to complain"); United States v. Young, 745 F.2d 733, 752 (2d Cir.1984) (holding that "not even the plain error doctrine permits reversal on the ground that the trial court granted a defendant's request to charge").

The doctrines of waiver and invited error exist precisely to prevent defendants from engaging in the sort of gamesmanship the defendant is playing here—mounting a post-conviction attack on favorable jury instructions he requested at trial.  See United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) (when a defendant "is attempting to evade the consequences of an unsuccessful tactical decision . . . we have no difficulty concluding that [he] has waived appellate

34

review"). The defendant requested the Expanded Justification Charge because it benefitted him. It gave the jury greater latitude, beyond the latitude afforded to ordinary citizens, to find that his use of lethal force was justified. The defendant obtained the benefit of this defense-friendly instruction even though the evidentiary record did not support it. By his own admission, the defendant was not a police officer. (See Trial Tr. 1094-96.) The record likewise did not contain any evidence that he was a "peace officer." (Trial Tr. 1274-1278.) And the Court did not believe that the evidence supported the defendant's claim that he was authorized to make an arrest or acted to prevent an escape from custody on September 4, 2023. (Trial Tr. 1215; 1216-1218; 1223; 1272-1273; see also Trial Tr. 1248; 1267-1269.) Had the issue been left for the Court to decide, the defendant would not have qualified for the Expanded Justification Charge. But because the Court telegraphed its views, the defendant asked that the jury, not the Court, decide whether he had the authority to arrest, casting the matter as an issue of fact, not law, in the hope of availing himself of an additional basis for justification, increasing his chances of acquittal. That was a tactic, and it did not work. The defendant cannot now reverse course and complain about the fact that the Court did the very thing it asked the Court to do at trial.

ii.    The Expanded Justification Charge Was Proper

The Court did not err, never mind plainly err, in giving the Expanded Justification Charge.

The procedure for requesting and objecting to jury instructions is codified in Federal Rule of Criminal Procedure 30. Rule 30(d) provides in relevant part that a "[f]ailure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b)." Federal Rule of Criminal Procedure 52(b) provides that "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention."

35

To establish plain error, a defendant must demonstrate that: "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the [defendant's] substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affect[ed] the  fairness, integrity or public reputation of judicial proceedings." United States v. Marcus, 560 U.S. 258, 262 (2010) (citation and internal quotation marks omitted).  An error is "plain" only when it is "clear under current law." Olano, 507 U.S. at 734.  An error invited by a defendant on tactical grounds is not typically susceptible to plain error.  See United States v. Prawl, 149 F.4th 176, 188 (2d Cir. 2025) (noting that the Court is "more inclined to deem an error 'plain' where it is clear from the record that failure to object below was not the result of a strategic decision").

A defendant's substantial rights are affected only when there is a "reasonable probability that the error affected the outcome of the trial." Marcus, 560 U.S. at 262; see also United States v. Dominguez Benitez, 542 U.S. 74, 81 (2004) ("To affect substantial rights, . . . an error must have substantial and injurious effect or influence in determining the . . . verdict.") (citation and internal quotation marks omitted). If the first three elements of the test are satisfied, the court has the discretion to correct the error "in those circumstances in which a miscarriage of justice would otherwise result." United States v. Frady, 456 U.S. 152, 163 n.14 (1982).  "In general, it is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." United States v. Weintraub, 273 F.3d 139, 145 (2d Cir. 2001) (citation and internal quotation marks omitted).

Here, there was no error.  The Expanded Justification charge required the jury to determine whether the defendant used unreasonable force while attempting to make an arrest. Implicit in that determination is whether the officer had the authority to arrest.  Whether the

36

defendant was authorized to arrest under DOJ policy depended upon "specific facts and circumstances" (GX 307 at 19), including whether one of the four crimes for which a BOP correctional officer was authorized to make a warrantless, off-property arrest had occurred. In leaving it to the jury to answer that question, the Court appropriately deferred to the jury's fact-finding function.

Nor did the Court "channel[]" the jury to a "narrower standard." Def. Mot. at 13. Quite the opposite. Instead of rejecting the defendant's request for the Expanded Justification Charge, the Court adopted the very jury charge the defendant formulated and gave him an opportunity to present to the jury an additional basis to justify his conduct. The defendant's inability to persuade the jury was due to the overwhelming evidence at trial, not an error by the Court.

Even if the Court's justification instruction was erroneous (and it was not), the defendant has not satisfied any of the other plain error standards. The defendant's request to charge was the sort of strategic decision that precludes a finding of "plain" error. See Prawl, 149 F.4th at 188. Granting relief to the defendant, on this record, would give license to defendants to invite errors and seek post-trial relief afterwards, which would undermine the integrity and fairness of the judicial proceedings. And the defendant has not adequately explained how the Court's broader justification charge affected the outcome of the trial. The jury readily returned a guilty verdict. None of the jury notes sought clarification on justification. The defendant's self-defense claim was plain as day for the jury to consider, no matter what instruction was given. The quick verdict illustrates that the jury was not confused. It simply did not find the defendant credible.

The Defendant Never Asked for a "Missing Evidence" Charge

The defendant asserts that the Court "denied the missing-evidence instruction," related to the government's supposed investigative failures to locate and secure the BMW within

37

six weeks of the shooting and identify who operated MDC-Brooklyn's surveillance cameras on September 5, 2023.  Def. Mot. at 12 (citing Trial Tr. 1410).

This claim has several failings.  Chief among them is that the defense never sought—and the Court therefore never had occasion to deny—a missing evidence instruction.  (See ECF Nos. 36 and 48; Tr. 1208-1293; 1436-1437.)  Nothing on page 1410 of the trial transcript (or any other page) reflects that such an instruction was even considered.  Nor is it clear what a "missing evidence" charge would have even entailed.  A claim that the government's investigation was shoddy, which is made by virtually every defendant at trial, is the stuff of defense summations, not jury instructions.  To the extent it would have been appropriate to seek such an instruction at trial (and it would not have been), the defendant waived it by failing to ask for one.

The Court's Supplemental Instruction After Closing Statements Was Proper Because the Defendant Improperly Invited the Jury to Speculate

The defendant asserts that the Court's supplemental instruction addressing the defendant's improper closing argument about the absence of surveillance footage depicting the defendant's encounters with Dylan Carreras improperly targeted the defense theory, in violation of Federal Rule of Criminal Procedure 30.  Def. Mot. at 14-15.

Under Federal Rule of Criminal Procedure 30, the court must inform counsel "of the instructions to be given before closing argument . . . ." United States v. Civelli, 883 F.2d 191, 196 (2d Cir. 1989).  However, "[i]f a supplemental charge is legally correct, the district court enjoys broad discretion in determining how, and under what circumstances, that charge will be given." Id. at 195; see also United States v. White, 552 F.3d 240, 250 (2d Cir. 2009) (holding that curative instruction was correct where it "refocused the jury on the [proper] elements"); United States v. Patterson, No. 21-1678-cr, 2022 WL 17825627, at *4 (2d Cir. Dec. 21, 2022) (affirming conviction where district court gave post-closing supplemental instruction in response to

38

misleading defense summation); United States v. Gracesqui, 730 F. App'x 25, 28 (2d Cir. 2018) (affirming conviction where supplemental instruction was "legally sound and added little to the original charge").

Where a party preserves a challenge to a jury instruction, the Court reviews the charge de novo, United States v. Han, 230 F.3d 560, 565 (2d Cir. 2000), and "will not find reversible error unless the charge either failed to inform the jury adequately of the law or misled the jury as to the correct legal rule," United States v. Henry, 888 F.3d 589, 598 (2d Cir. 2018) (citation and internal quotation marks omitted).  In this context, the Court does not "review portions of jury instructions in isolation, but rather consider[s] them in their entirety to determine whether, on the whole, they provided the jury with an intelligible and accurate portrayal of the applicable law." United States v. Ford, 435 F.3d 204, 210 (2d Cir. 2006) (citation omitted).  For supplementary instructions in particular, "legal sufficiency . . . must be assessed in the context of the instructions as a whole." United States v. Denkberg, 139 F.4th 147, 160 (2d Cir. 2025) (alteration in original) (citing United States v. Velez, 652 F.2d 258, 261 (2d Cir. 1981)).  "Finally, even if some error can be found in the supplemental charge, it will not ordinarily require reversal where there is no evidence that the defendant was prejudiced by it . . . ." Velez, 652 F.2d at 262 (citing United States v. Gleason, 616 F.2d 2, 21 (2d Cir. 1979), cert. denied, 444 U.S. 1082, 100 S. Ct. 1037, 62 L.Ed.2d 767 (1980)).

The Court's post-summation curative instruction was legally sound.  It appropriately corrected an improper argument made during summations inviting jurors to speculate.  The record did not contain any evidence that video surveillance capturing Carreras' interaction with the defendant even existed, much less that the government failed to obtain it.  The

Court was therefore correct in cautioning the jury not to speculate about the existence of evidence not admitted at trial, a standard instruction delivered at virtually every trial.

The Court's post-summation instruction was also warranted. At the charge conference, the Court warned the parties not to make improper arguments or else it would be forced to address those arguments. (See e.g., Trial Tr. 1238 (Court acknowledging that a changed circumstance after summation could warrant additional instructions).) The defense did so anyways. Once again, the defense should not be able to complain about a decision he and his counsel made during trial that he now regrets.

Finally, the defendant was not prejudiced by the supplemental instruction. In total, two additional sentences were added: "[i]n addition, you heard argument about how other evidence had to exist, such as surveillance video, but was not introduced at this trial. You are not to speculate about whether any such evidence exists or what it might have shown." (Trial Tr. 1402-1403.) This additional language was legally accurate, neutral, and generalized. It did not name the defendant or his attorney. The notion that these two sentences materially affected the outcome of the trial strains belief.

### The Defendant's Rule 29 Motion Should Be Denied

#### The Government's Evidence Proved that the Defendant Acted Wilfully Under Section 242

The defendant asserts that the government did not present sufficient evidence establishing that he willfully violated § 242. Def. Mot. at 16-19. Not so.

Section 242 requires proof that the defendant acts with the specific intent "to deprive a person of a right which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them." Screws v. United States, 325 U.S. 91, 104 (1945). Even if there is evidence of unreasonable force under the Fourth

40

Amendment, the government must also show that the officer acted willfully, that is, for the specific purpose of violating the law. Id. at 101-07.   A "willful" act is one committed either "in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite." Id. at 105.

Willfulness can be inferred from "plainly" wrongful conduct, id. at 106, inconsistency between actions and training, United States v. Rodella, 804 F.3d 1317, 1338 (10th Cir. 2015), and efforts to prevent detection of wrongful behavior, United States v. House, 684 F.3d 1173, 1202 (11th Cir. 2012); see also United States v. Bradley, 196 F.3d 762, 769 (7th Cir. 1999) (explaining that shooting at fleeing motorist to stop flight, absent a showing of life-threatening conduct by suspect, provides "ample evidence" to conclude that the officer willfully violated suspect's Fourth Amendment rights); United States v. Proano, 912 F.3d 431, 439 (7th Cir. 2019) (when "an officer has been trained that officers should not do several things when confronted with tense situations, yet he does those things anyway, the fact that he broke from his training could make it more likely that he acted willfully."); United States v. Brown, 654 Fed. App'x. 896, 910 (10th Cir. 2016) (finding willfulness when Brown "took efforts to conceal his behavior by retaliating against those jail employees who honestly reported incidents involving use of force"); United States v. House, 684 F.3d 1173, 1202 (11th Cir. 2012) (finding willfulness when House took "efforts to prevent his superiors' detection of his actions" by "making false statements in his incident reports").

This case presents all three of these categories.

The defendant's conduct was patently outrageous.  Abandoning one's post at MDC-Brooklyn to engage in a high-speed car chase for miles across Brooklyn is bad enough.  Doing so without calling for back up or the police is worse.  And firing six times at a speeding car (while

41

also driving a speeding car) with innocent bystanders down range is remarkably dangerous. It is conduct that plainly violated multiple parts of the Department's use of force policy (GX 335-A)—which, of course, is not itself a crime, but illustrates how far out of bounds the defendant stepped. Nor was it a crime that occurred instantaneously. As the evidence showed at trial, the chase lasted for more than a minute, which gave the defendant an opportunity to roll down his window so he could line up his gunfire without shooting through his windows or windshield.

As a correctional officer, the defendant was trained on how to use lawful force, the limits of his authority, and his obligations to MDC-Brooklyn. Nothing about his conduct that night conformed with that training. It was not consistent with the use of force training he received annually, including months before the shooting. (GX 328, 329.) It was not consistent with his obligations to stay on post and report unusual incidents. (GX 314, 315.) It was not consistent with his obligation to immediately report anytime he fired his gun. (GX 306.) And it was not consistent with the limited authorities he had to make warrantless arrests off-property. (GX 307.) The defendant's answer to his flagrant policy violation is to say that "training evidence proves policy awareness, not constitutional knowledge." Def. Mot. at 19. But as the Supreme Court observed in Screws, a defendant need not "have been thinking in constitutional terms" to have willfully deprived another of a constitutional right. 325 U.S. at 106. And the defendant has no response to the many BOP witnesses who came to court and uniformly testified that there was no justification for leaving the property to chase a civilian. (Trial Tr. 414-18 [E. Santiago] 829 [Walker], 994-95 [Ramos].)

Despite the defendant's claims to the contrary, the defendant's efforts to conceal his crimes were highly probative of willfulness. See, e.g., House, 684 F.3d at 1202 (false statement in incident report probative of willfulness). Those efforts were extensive. Beyond failing to report

42

the chase or shooting, the defendant appeared to obscure which gun he used to commit the crime. (Trial Tr. 1197-98 [Auteri].)  And the following night, the defendant filed a false report about the circumstances of how he recovered contraband that night, illustrating his knowledge of both his reporting requirements and jurisdictional limitations.

The defendant asserts that his "escape belief" negates willfulness.  Def. Mot. at 17. But apart from his self-serving testimony, there was no evidence at all to suggest that an inmate escaped, let alone that he believed one took place.  In fact, the defendant's post-shooting conduct tells the opposite story.  When the defendant returned to MDC-Brooklyn, he talked to Ezequiel Santiago about contraband smuggling, not a suspected escape. (Trial Tr. 416 [E. Santiago].)

Viewing the evidence in the light most favorable to the government, the jury was entitled to conclude, as it did, that Wilson returned to MDC-Brooklyn on September 4 "happy" and "accomplished," (Trial Tr. 415, 417), because he did exactly what he set out to do:  fire upon civilian smugglers.

### The Defendant's Post-Trial Challenge to § 242 as a Crime of Violence Is Both Untimely and Wrong

The defendant claims that he has preserved his right to argue on appeal that Count Two of the Indictment was improper because 18 U.S.C. § 242 does not qualify as a crime of violence.[7]  This too should be rejected.

To the extent the defendant asserts that the § 924(c) charge should have been dismissed, that motion should have been raised pre-trial.  See Fed. R. Crim. P. 12(b)(3); cf. United States v. Davila, 461 F.3d 298, 308 (2d Cir. 2006) (noting that the failure to raise a defect in an

---

[7]     The defendant also argues that "if the Court enters a judgment of acquittal on Count One, no predicate offense remains to support Count Two, and it must be vacated as a matter of law," see Def. Mot. at 20, which the government does not dispute.

43

indictment before trial will result in the indictment being construed more liberally due to the "interest in judicial efficiency [concerning] tardily challenged indictments.") (citations omitted).

It also fails on the merits.  The dangerous weapon provision of § 242 constitutes a crime of violence because the use of such weapons inherently involves at least the threat of violent force.  See Rodella v. United States, 435 F. Supp. 3d 1222, 1253-54 (D.N.M. 2020), aff'd, 852 F. App'x 323 (10th Cir. 2021) (finding § 242's second clause divisible and constituting a crime of violence because "[a]ll jurors had to be unanimous on whether the offense caused bodily injury or the use or threatened use of a dangerous weapon").  This is in line with ample case law establishing that the use of a dangerous weapon during the commission of an offense constitutes a crime of violence.  See, e.g., United States v. Redrick, 841 F.3d 478, 484 (D.C. Cir. 2016) ("Certainly the additional element of 'use' of a dangerous or deadly weapon supplies at minimum a 'threat' of physical force against the person of another."); see also United States v. Shannan, 66 F.4th 1177, 1178 (8th Cir. 2023) (holding that "use" or "display" of a dangerous weapon "requires at least the threatened use of physical force"); United States v. Harris, 853 F.3d 318, 320 (6th Cir. 2017) (holding that "attempted or threatened offensive touching and use of a dangerous weapon . . . together add up to violent force, and thus to a crime of violence").  The use of a dangerous weapon during an excessive force incident, as alleged here, constitutes a crime of violence.[8]

---

[8]     The introduction to the defendant's motion asserts that he "moves for a judgment of acquittal on the grounds that the Government failed to prove willfulness on count One and failed to identify the firearm on Count Two," Def. Mot. at 2, but the body of the brief does not press this claim.  The government reserves the right to respond if the defendant's reply elaborates on this claim.

44

CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny

the defendant's motion for acquittal or a new trial.

Dated:    Brooklyn, New York
          March 16, 2026

                                        JOSEPH NOCELLA, JR
                                        United States Attorney
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201


                              By:    _____/s/_____
                                        Erin M. Reid
                                        Eric Silverberg
                                        Raffaela Belizaire
                                        Assistant United States Attorneys
                                        (718) 254-7000